on our call today. So I'm going to probably hold you pretty much to your 15 minutes. So for the appellant, make sure that you reserve some of your time for rebuttal. The thing in front of you is not a microphone. It will not make your voices louder. It just records them. So please speak up so that everyone can hear you. And I'm going to ask the clerk, good morning, to call the first case. Case is 11-2429, Illinois Law v. City of Chicago. And I should say this, too. When counsel steps forward, if you just please identify yourself. Good morning, your honors. Jeannie Brown on behalf of the appellant. May it please the court, respectfully, your honors, it's our position that the trial court erred in granting summary judgment in this case. Specifically, the trial court was an error when finding that the defect that caused the plaintiff's injury in this case was open and obvious. It's clear that there's a factual dispute as to the physical nature of the condition. If you look at the photographs that are provided, and specifically the photographs that are taken from the perspective of someone crossing the street, it's clear that as you're approaching the defect, it's not visible. It's impossible to see unless you're standing directly over the defect. As the plaintiff testified, she did not see the defect until she fell on it. I just want to interrupt you for one second. Are you saying that until you get up to it, you cannot see the dugout street next to the curb? I apologize, your honor. Just because I've looked at the photographs, and the photograph seems to be some distance away, and yet you can see an obvious lowering of a really smooth street into a dugout, gravelly looking area. I'm saying that the dugout gravel area blends in with the street, and so I believe, as the plaintiff testified, she could not see the defect while she was crossing the street. But that's because she said that there was a hump in the road that prevented her from seeing the dugout area from the side of the street that she began to cross. Now, there's no dispute that had she been coming in the opposite direction, that the dugout area would be very obvious. And in fact, as Justice Lamkin made clear, if you're standing in the middle of the street, at the highest point of the street, that hump area, is the dugout area visible at that point? Based on the plaintiff's testimony, and additionally the testimony Did she testify from that perspective? Was she ever asked the question that from the point where you're at the highest point in the middle of the street, can you see the dugout area? Was that question asked of her? She was not specifically asked that question, which I think in itself may create a question of fact, but she was asked Why would that create a question of fact? Well, let's start with your initial premise, which you say that it is not an open and obvious condition, but the court ruled that it was an open and obvious condition, and if we say that it was an open and obvious condition, then we're saying that it's a matter of law that it's open and obvious, and the only way you can prevent that finding, to the extent that it's a question of fact, is by making clear that there's a question of fact as to whether or not it's open and obvious. Is that your position, that there's a question of fact as to whether it's open and obvious? Yes, it's my position that there's a question of fact as to whether it's open and obvious. The case law supports that it becomes a question of fact if there's a dispute as to the physical nature, and I believe that the plaintiff Let's go on to that point. What is the dispute as to the physical nature of the condition of the street? Other than the plaintiff saying she can't see, she couldn't see it, and she didn't just say she couldn't see it. She said she wasn't looking. She was looking at the fact that the street was beautified and there was no debris and things around it. The plaintiff was specifically asked during her deposition, had you been looking down, would you have seen it? And she said, no. She said, well, we do have the testimony. At a certain point, at a certain point, if you're looking down, you've got to be able to see it, right? So that cannot be true from the point that she begins, it may be true from the point that she begins crossing the street, but at some point as she nears that dugout area, if she looks down, she's got to see it, wouldn't you say? According to her testimony So at her deposition, did she identify the point at which she could not see it, had she been looking down? Was that what prefaced that question? The question wasn't very specific. The question was, had you been looking down, would you have seen the defect? And she said, no. And it didn't say at which point of her travels across the road? It did not, Your Honor. Well, my point is that obviously we can't take that statement at its literal value, because if she's one foot away from the dugout area, and she looks down, is there any question but that she would see it? Do you believe that she wouldn't see it? Well, did the photograph show that she wouldn't see it? If it were just the plaintiff's testimony in this case providing that, then maybe not. But we have testimony from a complete third party that provides the same exact explanation as Ms. Balogh. She's walking on the same side of the street. Yes. I'm sorry. I hate to interrupt you. But the other witness says she's walking across the street not paying any attention to what she's doing, looking all around, talking to her boyfriend, and almost tripped at that same spot. And then looked down to see, you know, what she tripped on. But the fact that she was walking across the street, the photographs that were prepared, I assume, by the plaintiff were taken from I can't say how far, but certainly it looked like a number of feet away, maybe 10 or 15 feet away from the other side. And you could clearly see the gap. The gap ran along the east-west side of that intersection of that street, and then north-south. And it was wider going north-south and jagged. I don't know if it was that wide. That's why I'm saying how could someone not see that? Isn't our test a reasonably observant, intelligent person under those circumstances? Isn't that the test that we have to look at? Yes. I apologize. It's that of a reasonable person in plaintiff's position with, you know, a lot of evidence. That's why I think it's important to consider Ms. Myers, the third party's testimony. She was only minutes ahead of Ms. Balogh and tripped on the same defect. This defect, it's important to remember, it's in a crosswalk. As she's... Did she testify that had she been looking down, she wouldn't have been able to see it either? She testified that she did not see the defect until she... Did she testify that had she been looking downward? I don't believe she was specifically asked that question. Counsel, is it reasonable to assume that if, as Ms. Balogh has testified, that for six months she had witnessed the construction that was at that intersection and that she was admiring the fact that the construction was removed, that a reasonable person seeing that the construction was removed was walking on the street assuming that all the repairs had been made? And is it not reasonable for her to put one foot in front of the other assuming that there were no longer any defects? Absolutely, Your Honor. It's not only reasonable because Ms. Balogh testified that this construction was ongoing at this intersection for six to nine months. During this whole time, there were signs, there were barricades, there were warnings. All of a sudden, she gets up to go to church on Sunday, all the barricades are gone, the streets look newly paved, and so she's admiring the fact that the construction's gone, completed, I'm sorry, and proceeds to cross the street not expecting any defect within the road whatsoever, especially in the crosswalk. It's an area that's less than a block from a church, and so I think it's reasonable for her to assume that at least the crosswalk area is going to be complete. So what do you think should have been done in this case? I think at the very least, the area within the crosswalk should have been filled in to allow it to be flushed with... Well, I assume it wasn't filled in because it had to wait until it was cured or until a certain time passes. Short of filling it in, short of making it perfect, what do you think should have been done here to prevent this sort of lawsuit from being filed? I have a few easy, simple solutions, and I think that one, leaving the signs up or some kind of barricade, something, to indicate construction's still going on. It would have been very easy for them to do so since they were up for nine months prior to that. Secondly, if putting up signs is too much... Do you think that streets or sidewalks are sidewalks in the city of Chicago tend to be evenly laid out so that there's no unevenness in the sidewalk that might cause someone to trip over? So does the city have an obligation to do that everywhere where it exists, even in the absence of actual construction being performed at that location? Absolutely not. Why in this case should there have been something more than what was done? One of the reasons is because there was this construction going on for such an extended period of time that individuals in that neighborhood would reasonably assume that the construction is complete. That's one of the reasons. Another reason is it's within the crosswalk. Are we limiting ourselves to reviewing what an individual in the neighborhood happens to park and begins walking across the street? Why should it make a difference whether that person was aware of prior construction or not? It doesn't. I mean, it's still that. The standard is still that of a reasonable person in plaintiff's position. And I think that the testimony of Ms. Myers, I'm sorry, coupled with the plaintiff's testimony clearly creates a question of fact. Let me go back to the ruling by the plaintiff's attorney. And the case law is clear. And I think you cite the case in particular. It's standard parking. It's a very succinct opinion and very clear in terms of what needs to exist to prevent a ruling as a matter of law as an open and obvious condition. And it states that to prevent a ruling as a matter of law, to create a question for the jury for the trier of fact, there must be a dispute about the physical nature of the condition. And that's what I was getting at. What do you assert to be the dispute about the physical nature of the condition? Because in standard parking, it was the absence of the, it was a wheelchair ramp that wasn't painted to distinguish it from the surrounding area and nobody really saw it or the plaintiff didn't see it and had it been painted yellow as it was required to be painted, it would have made clear that it was something different than she otherwise would have seen. So what in this instance is there about the physical nature of the condition that leads to a dispute giving rise to a question of fact? I believe this case is very similar to Al-Khwati. I believe it's the visibility and also, your honors have indicated in the pictures, it appears to be clear in the pictures, the dugout area, the dugout area, that's where the sidewalk blends in with the street. And you expect that area to be flush with the sidewalk. So I believe it's the visibility. Here's the difference between this case and the standard parking, the Al-Khwati that you just mentioned. In that case, there was an expert witness that persuaded the court that a question of fact existed. There was an engineer who gave testimony to the court that there was a question of fact in the testimony. And regarding the question of law, regarding the open and obvious condition, the court said we must disagree based upon the testimony of plaintiff's expert. And you can see why that sort of condition or why that sort of requirement might be required, because otherwise, the city of Chicago, given the state of the sidewalks, given the unevenness of even the most recently constructed sidewalk, might run across a great number of lawsuits. And there has to be a way to say this one goes to a jury, this one does not. And the question is, how do we make sure to have drawn that line based on the expert testimony? We don't have an expert testimony here, do we? No, Your Honor. But we do have the testimony of a third party who testifies that she, too, did not see this defect. I understand that the expert... Does that make it simply 1 plus 1 in terms of subjective viewing of the street? No. Where is the objective standard that we have to apply? The objective standard that we have to apply is the testimony of the expert in El Quadi went to the visibility and the fact that the expert felt that there should have been contrast paint to allow for that visibility. And I believe that in this case, it's the same situation, whereas if they would have maybe spray-painted within the crosswalk orange or something to draw the individual's attention... And had Justice Cahill reviewed it... Then it would have been the same situation. And he would have written that even without considering the expert's testimony, we would find a question of fact as to the nature of the open and obvious condition to preclude summary judgment. That case might support you. But he didn't say that. What he said was the expert's testimony gave rise to a question of fact on the visibility issue. You're absolutely right. And we can't do that. And I can understand why that might be something you might otherwise have to put forth as the plaintiff, because otherwise, how many instances of cases like this might arise? I'm sorry, but every plaintiff could say, I didn't see it. I didn't see it. And the judge could never say, well, unfortunately, I haven't read the entire record, so I don't know if anyone ever said the width of that defect or excavated area. But it's not just in the crosswalk. You keep saying it's in the crosswalk. But it's east of the crosswalk, the lines, and it's west of it. And then it's north and south of it, or several car lengths and jagged. I mean, the edge of it is jagged. If someone were to look in the crosswalk, it would have been jagged. But it's up and walking and not looking somewhere else. I keep saying the crosswalk because I think that it's reasonable for an objective person to expect it to be safe to proceed in a crosswalk where you're intended to be proceeding. You expect the streets to be flush or level with the sidewalk. You don't expect to have to step up on a curb, so that's why you keep going back to the crosswalk. And in terms of the record, when she fell at the point of stepping up to the curb, she fell at the point of the closest point to her between the even pavement and the dugout area. I'm not sure the record is exactly clear whether she fell on entering the excavated area or stepping up for either Ms. Myers or Ms. Maylow. Let's say it was your end. I mean, someone can sense that they're walking on a gravel as opposed to a finished pavement, based on their shoes. You look down, and so it couldn't have been at a point of stepping up because she's already traversed it a few feet or maybe one feet, maybe a couple steps. Well, I believe that if the point of impact, I guess, is as she's stepping down into the excavated area, it just supports the argument as to the visibility of it, because that area, like I said, blends in. Didn't Ms. Myers testify that the first foot would go into the ditch and the next foot would have been going to the curb, that that was the distance between one foot walking and then the next one following it? I think we have testimony to that effect. Yes, Your Honor, Ms. Myers did testify that either stepping down or stepping up, you were going to most likely trip on the defect. My question, counsel, is going back to 3104. It reads that the local MC would not be liable for an injury caused by the failure to initially provide regulatory control devices, including barriers. What do you find is the significance of the fact that the city would not be liable initially for putting up barriers, but then if they put up those barriers and then remove them, is that an opening for them to be liable after the removal, after the premature removal of barriers, which would indicate to someone who was crossing the street that that was no longer a problem? Is that a heightened responsibility, do you see in that? I apologize for interrupting, Your Honor. I believe that by removing the signs before the construction is complete, after they've been there for an extended period of time, gives individuals a false sense of safety and security. You didn't assert that there was a premature removal of the barricades that may have been up prior or during the actual construction of the street, did you? You didn't assert in your complaint that there was a premature removal of the barriers that may have been up prior or during the actual construction of the street, did you? You didn't assert that there was a premature removal of the barricades or of the cones or the things that might have given notice to a pedestrian that construction was underway. You didn't assert that in your complaint, and you didn't seek to depose any worker from the city of Chicago to determine why the prior barricades or things to determine why the prior barricades or things to determine why the construction was underway were removed at the point they were, did you? Well, we do argue that these barricades and signs were there for nine months. Ms. Bailoff testified that they were there for the same period of time they were removed. Did you seek any additional information from the city to find out why they were removed, when they were? I don't think that issue was ever disputed from the very beginning. Counsel, isn't it a matter of race if it's a low-gooder and this street was still in disrepair and not finished, that the barriers were removed prematurely? Yeah, absolutely, your honor, that would be our position. Can you just give rise to reps if it's a low-gooder, based on logic as opposed to pleadings? Well, no, I think it's further supported by the fact that this wasn't something that was disputed by the city at any point in this litigation. Counsel, I know we've asked you a lot of questions, but you're going to have to respond to them. Is there any other questions that you'd like to wrap it up? Thank you. You'll have time for rebuttal. Thank you, your honor. Just real briefly, I just think that it's important in this case to consider the totality of these circumstances and all of the factors involved, the fact that the signs were there and prematurely removed, the fact that there's testimony from a third party, a completely unbiased separate third party, that could fill the role, although not an expert, but to provide some support for the lack of visibility of the fact. Thank you. Thank you. May it please the Court, Justin Hooper for the City of Chicago. The Supreme Court probably granted some re-judgment to the city in this case because the excavated gap in which Ms. Balog fell was an open and obvious condition. To be open and obvious, a condition, was it a dangerous condition? I don't think it was a dangerous condition. I think it was a dangerous condition. There's no testimony in the record as to whether it was dangerous or not. We might have that opinion, but the question here is whether it was open and obvious. Well, there's cases that say that if there's a dispute between the parties as to whether or not a condition was dangerous, that gives rise to a question of fact, which precludes summary judgment from being granted. I'm not aware of any cases dealing with the open and obvious doctrine that say that dangerousness is the question, rather the physical nature of the condition is what's at issue. And here, the physical condition is not at dispute. The photographs in the record taken by Ms. Balog's brother at the time of the accident show that within the intersection, that a person approaching the condition could see it. This was a significant amount of removed pavement. And yet two people who approached the intersection did not see it. So why would the physical condition not be in dispute? It wasn't obvious to them. Well, we judge this based on an objective standard, not on the subjective impression of those particular witnesses, particularly where both of them testified that they weren't paying attention to where they were going. Ms. Balog testified that she was looking up and admiring the niceness of the street and the finished construction in the area. And the other witness testified specifically that she was looking up at the trees. Whose objective standard were you basing it on? An objective, reasonable person. Would a reasonable person be looking where they were going and see this gap? You're saying these two people were not reasonable persons crossing the street? I mean, you didn't have an expert either, right? That's correct. And neither did the plaintiff. So what is the objective standard that you're basing it on? The objective standard is one of a person pedestrian exercising due care for her own safety. And the testimony was that neither was looking where they were walking. That's exactly correct, Your Honor. And here, in particular, it's reasonable to expect that a reasonable person looking out where they're going and taking care for themselves would be looking, particularly where they're stepping up onto the curb at the edge of the street, where there's generally a change in grade between the pavement and the curb. Counsel, isn't there a case law that says one need not traverse down the street constantly looking downward in order to be determined as a reasonable person crossing the street? Isn't that case law or not? That's correct, Your Honor. There is a case law that says that. But in that case which held that, the defected issue was a small defect in a mat inside of a locker room. This is not a small defect on a mat that might trip someone. This is a large excavated gap of pavement that extended all the way around both sides of the corner of the street. Do we have the dimensions, as Justice Lampkin asked, and as it appeared based on the other testimony, the other pedestrian that was walking down the street, that it only took one step or two steps to cross over that gap? We don't have any record testimony about what the exact dimensions were, but we do have photographs. But you just described it as large or big. Well, it's clear from the photographs taken from a position inside the intersection that you can see this gap extending all the way around both sides of the sidewalk from within the intersection. And that's, although we don't know the exact dimension as far as width, we can see clearly the length on both sides and the clear visibility of this gap from within the intersection. In fact, Ms. Bailar, I don't know if you can see it that way either. There is no dispute about whether there were leaves, debris, dirt or traffic or lighting that caused Ms. Bailar or the witness to fail to see it. And it's 1115 in the morning. That's correct. So why didn't the city just leave up the barricades? As Your Honor pointed out, there was no witness who testified who was asked about that. But it wouldn't matter anyway, because what's clear under the law is that there is no duty to warn of a condition that is open and obvious, because such a condition is open. And for that reason, it's irrelevant whether or not there were warning signs at the time. Because any person, a reasonable person approaching the intersection would see this gap without warning signs. Well, the reasonable person wouldn't be able to see it from the opposite side of the street because of the hump in the street, right? Both witnesses testified that that was the case, but neither one disputed that it could be seen from within the intersection. Indeed, the witness to the accident, Ms. Myers, testified in her deposition that after reviewing photographs of the scene that indeed she could see it on approach and that the reason she missed it at the time was because she wasn't looking. And in fact, when Ms. Bailogh was asked directly, could you see this as you approached it, after she testified that she couldn't see it from the other side, first she said, well, I didn't see it. And then she was asked again, and she said, from crossing, no. So she did not dispute that she could see it as she approached it. She disputed that she couldn't see it as she was crossing. And given that you couldn't see it from the opposite side of the street, is it not unlike a road that curves around some sort of obstacle or street or mountain, and you can't see the other side, but that doesn't mean that the other side is identical to the side that you've just crossed? That's true, Your Honor. Actually, when you look at the pictures and the records, you'll see that the same gap actually appeared at the side where Ms. Bailogh was standing. So not only is there an expectation that it might be different, but there's an expectation that it might be the same as well because the same work had been done on the other side of the crosswalk. So she, in fact, crossed that same condition just on the opposite side. That's correct, Your Honor. And why doesn't that give sufficient notice as to the condition on the other side? Well, Your Honor, I don't know that we would argue that as a matter of law that seeing a condition on one side of the intersection when you can't see the other would, but it's certainly clear that a reasonable person crossing the street would be who could see this gap and anticipate the need to step over it. Or at least they have to exercise due care for their own safety and can't rely simply on what they cannot see. I believe that is clear as well. It wasn't one of your arguments that a reasonable person would have crossed over to the other side, and you just said just now that the same problem was on the other side. Well, that takes us to the deliberate encounter exception, which was raised by the plaintiff as a reason to get around the open and obvious nature of this condition. And in order to do that, she had to show that there was some compulsion that made her believe that she could have stepped over it if she had been paying attention, or if she didn't believe she could do that, she could have crossed and used the side. And encountered the same problem? No, when I said that the same condition is in the pictures, it's actually on the corner from where she started on the same side of the street. It's the southeast. Right. The east side of the street as opposed to the west side. And there's no testimony as to whether or not there was a condition on the other side because Ms. Balog didn't try to use the other side. But it's clear that if she had been paying attention, she could have at least stepped over this gap and not gone through it. This isn't the typical deliberate encounter exception case where there's a worker who's forced to face a dangerous condition as part of his job duty or something like that. In fact, there's been absolutely no evidence of any compulsion that's been shown in this case. And one final point that I'd like to raise is the immunity under Section 3-104. As far as the issue of whether the city should have put up signs or warnings, not only is that irrelevant to whether the condition was... Well, there is a question, as Justice Hall pointed out, that that statute only gives immunity for the initial placement of barricades. And those initial barricades have been removed. So why doesn't that expose the city to potential liability? That's correct. The statute actually talks in terms of initially providing barricades or warning signs. But as this Court held in Robinson, which we cited in our brief, that language, initially provide, is there to distinguish between the barricades or warning signs, between the decision to initially provide warning signs or not, and the improper maintenance of a warning sign, where a warning sign has been allowed to degrade or fall down and is no longer there after the decision was made to place it. In that case, the city can be held liable. And that's what the term initially provided is intended to show. And that's why here, where the decision was made to remove signs but then not to put them back up, that's the type of decision that actually is still immunized under 3-104. Is that regarding the less than substantial nature of the drop in the street from that even pavement down to the dugout area? Your Honor, I must confess that I have not considered that issue. It wasn't briefed, but we'd be glad to inform the Court if you think that that's an issue that you would like further briefing on. But it's certainly not something that I feel prepared to comment on. And for all of these reasons, the city would ask that this Court affirm the judgment below. Real briefly, I think that the fact that this excavated area was on the north side of the street as well as the south side, so Ms. Balogh and Ms. Myers were required to cross it before approaching the other side, further supports the fact that it's not open and they still trip and fall on the other side. Obviously, if they noticed it on the one side, they would not have tripped on the opposite side of the street. And as Justice Hall correctly pointed out... Let's go back to what you said she testified. She testified that upon approaching the street, she was noticing how everything was beautiful and everything had been completed and she thought everything was the way it should have been. But obviously, that statement can't be entirely correct because as she crossed the street, she had to traverse the very same condition on the first side and that existed on the other side. I don't understand your question. I'm sorry. I think it's that she's not paying attention. Her claim that everything that she had believed, all the construction had been completed, can't be accurate because when she steps down into the street, she's stepping down into the very same sort of condition that existed on the opposite side that resulted in her fall. But she did testify that as she was crossing the street, she did look across the street. She could not see any defect. And as Justice Hall correctly pointed out, the case law does provide that you're not required to constantly be looking down, especially, I would think, when you're in a crosswalk and there are other things that, you know, you need to be paying attention to. As you're approaching the curb, you shouldn't, the reasonable person shouldn't be required to constantly be looking down and expect there to be some kind of step or drop. You don't have to look down. You just need to look forward and if you see no condition that might pose a risk, then you don't have to look down again. But if you can't see the other side, then it might behoove you to, once you get to the point where you can see the other side, to take a look again to make sure that there's no condition that might pose a risk for you. That's why, based on all the other evidence in this case, I don't believe that this excavated area was visible while you're approaching the defect. It has to be visible to some extent. It's a matter of common sense, no? The map in the case cited by counsel was found to not be open and obvious and that was due to a number of different reasons, and one being that there was a short time, a short window of time in which to discover the defect. So yeah, at some point it does become visible, but if there's not enough time to react, then it's not open and obvious. And that's supported by that D.B. Caglean case. Thank you.